Justin A. Savage*
jsavage@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: +1 202 736 8000
Facsimile: +1 202 736 8711
*Pro hac vice application forthcoming

David R. Carpenter (SBN 230299)
drcarpenter@sidley.com
Caleb J. Bowers (SBN 332189)
cbowers@sidley.com
SIDLEY AUSTIN LLP
350 South Grand Avenue
Los Angeles, CA 90071
Telephone: +1 213 896 6000
Facsimile: +1 213 896 6600

Attorneys for Plaintiffs
SPECIALTY EQUIPMENT MARKET
ASSOCIATION & PERFORMANCE RACING,
INC.; NATIONAL TRUCK EQUIPMENT
ASSOCIATION

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SPECIALTY EQUIPMENT MARKET ASSOCIATION & PERFORMANCE RACING, INC.; NATIONAL TRUCK EQUIPMENT ASSOCIATION,<br><br>Plaintiffs,<br><br>vs.<br><br>CALIFORNIA AIR RESOURCES BOARD; STEVEN S. CLIFF, in his official capacity; ROBERT A. BONTA, in his official capacity; and DOES 1 through 25,<br><br>Defendants. | Case No.<br><br>**COMPLAINT OF SPECIALTY EQUIPMENT MARKET ASSOCIATION & PERFORMANCE RACING, INC. & NATIONAL TRUCK EQUIPMENT ASSOCIATION AGAINST CALIFORNIA AIR RESOURCES BOARD, STEVEN S. CLIFF, ROBERT A. BONTA, AND DOES 1 THROUGH 25 FOR DECLARATORY AND INJUNCTIVE RELIEF** |

SEMA & NTEA COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**INTRODUCTION**

1.      The Advanced Clean Fleets ("ACF") Regulations issued by the California Air Resources Board ("CARB") are part of California's efforts to ban the internal combustible engine entirely.  Specialty Equipment Market Association & Performance Racing, Inc. ("SEMA") is a trade organization whose members own and operate fleets of vehicles regulated by ACF, and who manufacture, market, and sell specialty automotive aftermarket products for vehicles that ACF seeks to ban.  SEMA has long worked closely with CARB to ensure that aftermarket automotive parts meet applicable clean-air standards and does not oppose electric vehicles ("EVs") or the adoption of other alternatives to traditional internal combustion engine ("ICE") vehicles.  Indeed, the specialty automotive aftermarket industry SEMA represents has led the way on alternative-fuel innovations, from replacing older engine technologies with newer, cleaner versions, to converting older ICE vehicles to new electric or hydrogen-powered vehicles.  The ACF Regulations, however, far exceed California's constitutional and state statutory authority and in many ways will undermine—rather than foster—the innovation that historically has generated so many novel ways to drive the development of cleaner, safer automobiles.

2.      National Truck Equipment Association – The Association for the Work Truck Industry ("NTEA") represents companies that manufacture, distribute, and use work trucks across North America and globally.  Many of these companies are considered small businesses, and they often operate on a local or regional basis.  And many work trucks are designed and produced individually or in small orders, often on a multi-year timeline.  These trucks are often mission-essential for uses such as repairing utility lines after storms and fires or plowing snow.  Without these vehicles, California's infrastructure, utility services, emergency services, and other vital components for daily life and the state and national economy, stop working.  The ACF Regulations fail to account for these specialized vehicles and applications, some of which are wholly unsuited for battery electric vehicle use.

SEMA & NTEA COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

3.     CARB's ACF Regulations include its "High Priority Fleets Requirements,"[1] "Drayage Truck Requirements,"[2] "2036 100 Percent Medium- and Heavy-Duty Zero Emissions Vehicle Sales Requirements,"[3] and "State and Local Government Agency Fleet Requirements"[4] (collectively, "ACF" or the "ACF Regulations").  Through these ACF Regulations, CARB requires that only zero emission vehicles ("ZEVs") may cross within California's borders, regardless of the state of purchase or the state of registration or domicile for the vehicle.  Vehicles covered by the regulation include work trucks, pickup trucks, light-duty package delivery vehicles, transportation shuttles, specialty vehicles and heavy-duty tractors with sleeper cabs, for example.[5]  Interstate motor carriers and others—if they do not own CARB's vehicle of choice—must not operate within the nation's largest single-state economy for even a moment.

4.     SEMA and NTEA (collectively, "Plaintiffs") recognize that the ACF Regulations are currently being challenged in other pending lawsuits.  SEMA and NTEA felt it important to bring this suit on behalf of their respective members, including to provide additional perspective on issues raised by the ACF Regulations that impact their members and the importance of bringing such an action now:

a. **Ripeness**: CARB has announced a voluntary "enforcement stay" of the ACF Regulations pending certain proceedings before the U.S. Environmental Protection Agency ("EPA").  Nonetheless, regulated entities that include SEMA and NTEA members must comply with the ACF Regulations *now*.  Among other things, CARB's "stay" has explicitly required parties to comply with ACF requirements since January 1, 2024, and reserves CARB's right to enforce ACF's provisions retroactively—including by forcing fleets to remove vehicles newly added to their fleets—once the proceedings before the EPA conclude.

---

[1] Cal. Code Regs. tit. 13, §§ 2015 *et seq.*

[2] *Id.* §§ 2014 *et seq.*

[3] *Id.* §§ 2016 *et seq.*

[4] *Id.* §§ 2013 *et seq.*

[5] *See* Table A, CARB, FAQs, Advanced Clean Fleets Regulation - ZEV Milestones Option, available at https://ww2.arb.ca.gov/resources/fact-sheets/advanced-clean-fleets-regulation-zev-milestones-option.

b. **Preemption**: The Clean Air Act ("CAA") and Federal Aviation Administration Authorization Act ("F4A") each preempt the ACF Regulations because the ACF requirements purport to allow CARB to enforce its new vehicle emissions standards against any vehicle that *operates* in California, even if that vehicle was subject to federal standards when purchased or sold (i.e., outside of California), and even if that vehicle is a motor carrier operating in interstate commerce.  While CARB is seeking a CAA waiver from EPA under 42 U.S.C. § 7543 (Section 209 of the CAA) ("Section 209"), this lawsuit involves principles beyond and more fundamental than EPA's specific waiver analysis.

c. **State law prohibition**: The California legislature prohibited CARB full-stop from setting the prohibitions contained in the ACF Regulations when it declared that CARB "shall not require . . . a ban on the sale of any vehicle category in the state" based on similar regulations contemplated by CARB more than 20 years ago.  Cal. Health & Safety Code § 43018.5(d)(2).

d. **Dormant Commerce Clause and Equal Protection Clause violations**: In addition to directly and unduly burdening interstate commerce, the ACF Regulations *discriminate* against out-of-state regulated entities.  Specifically, the Regulation is structured to place a burden on entities based on their *nationwide* operations, meaning that certain entities that operate primarily out-of-state have a greater compliance burden compared with similar entities that operate primarily or entirely in-state.  By way of example, a local fleet consisting of 49 in-state vehicles is not subject to the ACF Regulations, but a multi-state fleet with 49 vehicles in Nevada and just one vehicle operating in California would be subject to ACF, even though its footprint in the State is obviously much smaller.  The ACF Regulations likewise violate equal protection due to the arbitrary and irrational compliance burdens placed on out-of-state entities without justification.

e. **Due Process (vagueness)**:  Multiple ACF provisions render even the most fundamental requirements of the Regulations unconstitutionally vague, including among other deficiencies (i) duplicate compliance obligations that pertain to more than one entity for the same exact vehicle, (ii) provisions that commandeer virtually any entity that hires a

third-party carrier as a *de facto* enforcer of the regulation, (iii) indeterminate application of the rules for rented and leased vehicles, and (iv) CARB's failure to define its vehicle purchase exemption that supposedly is available for obtaining internal combustion engine vehicles when ZEVs are unavailable.

5.      SEMA and NTEA thus bring this action against Defendants CARB, Steven S. Cliff, and Robert A. Bonta (collectively, "Defendants") based on the interests of their respective members, who (i) own and operate fleets of vehicles regulated by ACF or (ii) manufacture, market, and sell specialty vehicles and automotive aftermarket products that may become obsolete in California and other markets if CARB is allowed to proceed in decreeing an end to internal combustion engine vehicles.  In bringing this action, SEMA and NTEA seek a declaration and injunction, and any other appropriate relief, to redress injuries and prevent further unlawful actions by Defendants in issuing and enforcing the ACF Regulations.

## JURISDICTION AND VENUE

6.      This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).  The federal claims asserted herein arise under, *inter alia*, the CAA, 42 U.S.C. §§ 7401 *et seq.*, the F4A, 49 U.S.C. § 14501, Articles I and VI of the U.S. Constitution, the 5th and 14th amendments of the U.S. Constitution, and Article I, Section 7 of the California Constitution.

7.      This Court also has supplemental jurisdiction over the state claim in this action pursuant to 28 U.S.C. § 1367 because the state claim forms "part of the same case or controversy" under Article III of the U.S. Constitution at issue in the federal claims.  The state claim asserted herein arises under California Health and Safety Code §§ 43000 *et seq.*, which provides requirements under state law for the regulation of vehicular air pollution relative to the same vehicles and vehicular emissions as the standards at issue in SEMA and NTEA's federal claims, to the extent those vehicles are subject to California's standards.

8.      This Court has authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983, and Rules 57 and 65 of the Federal Rules of Civil Procedure. This Court also has authority to grant declaratory and injunctive relief under the California Code of Civil Procedure §§ 526 *et seq.* and 1050 *et seq.*

9.      Venue in this district is appropriate pursuant to 28 U.S.C. § 1391(b) and Local Rule 120(d) because CARB maintains its principal offices within this judicial district.  The hearing and vote to adopt ACF occurred in this district, along with CARB's acts and omissions giving rise to this action.

**PARTIES**

10.     Plaintiff SEMA is a national trade organization representing over 7,000 companies that comprise automotive aftermarket equipment distributors, original and specialty equipment manufacturers, and interstate motor carriers, and include the automotive aftermarket industry that employs over 1.3 million Americans and contributes $337 billion annually to the U.S. economy. SEMA advocates on behalf of its members for laws and regulations that appropriately foster interstate transportation and protect consumer choice.

11.     SEMA members own, operate, and hire motor vehicles and fleets that transport property throughout the United States, including in California.  Many SEMA members are based in this judicial district or provide automotive parts and transportation services within this judicial district. Activities of SEMA members are subject to the ACF Regulations.  ACF members have fleets based outside of California that include vehicles operating in California as well as fleets based entirely in California.

12.     SEMA advocates for responsible laws and regulations so that specialty aftermarket businesses can thrive and consumers can benefit, while also protecting consumers' rights to own and drive customized vehicles.   For decades, SEMA has worked with EPA and CARB to promote emissions compliance with the CAA and parallel California laws.

13.     SEMA also operates the nation's leading emissions testing lab for the aftermarket industry, SEMA Garage, which gives SEMA members access to state of the art tools for emissions measurements.   This enables SEMA members to demonstrate that their products meet emissions compliance criteria—a compliance path for installing performance and engine aftermarket products on motor vehicles.

14.     Plaintiff NTEA represents over 2,000 member companies that manufacture, distribute, and use work trucks across North America and globally.  Many of these companies are considered

small businesses, and they often operate on a local or regional basis.  NTEA members are based in this judicial district or provide vehicles, parts, or services within this judicial district.

15.    NTEA has always been fuel- and technology-neutral.  In 2007, NTEA held its first major event (the Hybrid Truck & Alternative Fuels Summit) addressing the "green revolution" and how it would impact the commercial truck industry.  In 2009, this event became known as NTEA's Green Truck Summit.  Held annually in conjunction with NTEA's trade show, Work Truck Week®, the Summit attracts over 500 participants who learn the latest about EVs, as well as other advanced vehicle technologies and fuels, to help reduce emissions and increase operational efficiency.

16.    Unlike mass-produced assembly-line passenger cars and trucks, commercial work trucks are primarily designed and produced individually or in small numbers on a custom-order basis. Their diverse applications, limited volume, and nearly limitless body and equipment variations dictate this production method.

17.    Many work trucks are considered mission-critical.  Emergency vehicles such as ambulances, fire trucks, and law enforcement vehicles are needed daily.  Utility trucks are needed to keep services such as power and water running, and utility fleets support one another with trucks and crews in the face of natural disasters like hurricanes.  Snow must be plowed; garbage must be picked up; packages must be delivered; downed power lines must be repaired; travelers need airport shuttle buses, and so on.

18.    Typically, commercial trucks are built in a multistage process involving three distinct yet interrelated industry segments.  To ensure product compatibility, a close working relationship is necessary between the truck chassis manufacturers and their dealers, truck body and equipment manufacturers, and truck body and equipment distributors (also known as truck upfitters).

19.    The vehicles produced by NTEA member companies for commercial or vocational use are incredibly diverse, reflecting the wide range of applications and industries they serve.  These include, but are not limited to, dump trucks, utility company vehicles, agricultural platform and stake body trucks, van-based delivery or service vehicles, shuttle buses, aerial bucket trucks, tow trucks, beverage delivery trucks, digger derricks, snow removal vehicles, fire trucks, ambulances, waste/recycling trucks and a host of other specialized configurations.  Work trucks play a vital role in

7

everyday life, supporting the activities of every significant sector of the economy, from agriculture and energy to utilities and construction.  Their diverse applications and unique production processes make them essential to our daily lives.

20.     Due to the ACF Regulations, SEMA and NTEA members must procure new ZEVs, including replacing existing vehicles before the end of their useful lives.  Members must choose either to divert existing fleet assets to avoid the California market entirely or to incur enormous operating costs to comply with expensive, cumbersome requirements for any vehicle operated in California for any period of time.  Members will suffer lost revenue and investments in, and are required to divert investment from, the California market as well as any states that would subsequently adopt California's requirements.  This includes products or technologies that will become obsolete due to the ACF Regulations.  And, members that manufacture vehicles or parts, or retrofit or upfit vehicles, for use in California will be unable to serve one of the world's largest economies in which they currently do business.  Members who have substantial sales in California will have their businesses eviscerated and some may be unable to continue operations.

21.     Defendant CARB is an agency of the State of California and includes a governing board comprised of sixteen members.  On information and belief, the current members of CARB are as follows: Liane M. Randolph, John Eisenhut, Susan Shaheen, John R. Balmes, Diane Takvorian, Cliff Rechtschaffen, Dean Florez, Hector De La Torre, Davina Hurt, V. Manuel Perez, Eric Guerra, Nora Vargas, Tania Pacheco-Werner, Gideon Kracov, Henry Stern, and Eduardo Garcia.

22.     Defendant Steven S. Cliff is the Executive Officer of CARB and its highest-ranking administrative officer.  Defendant Cliff is sued solely in his official capacity.  Collectively, Defendants CARB and Steven S. Cliff are referred to herein as "CARB."

23.     Defendant Robert A. Bonta is the Attorney General of California.  He is responsible for enforcing CARB's regulations, and he performs his official duties throughout the State of California.  Defendant Bonta is sued solely in his official capacity as the Attorney General of California.

24. Plaintiffs are ignorant of the true names and capacities of the Defendants sued herein under the fictitious names DOES 1 through 25 inclusive, which may include members of CARB. When their true names and capacities are ascertained, Plaintiffs will amend this Complaint.

**LEGAL FRAMEWORK**

25. The federal government regulates vehicle emissions and transportation, with a narrow carveout for certain California rules. The U.S. Constitution, federal law, California Constitution and state law prohibit California from regulating, and constrain its approach when it may regulate, as follows.

**Federal Regulation of Vehicle Emissions.**

26. <u>CAA History</u>. Congress first adopted the CAA in 1955, aimed primarily at increasing federal research and assistance in air pollution prevention, with no federal motor vehicle emission standards. As states began to adopt their own air emissions standards, Congress decided national standards were preferable because state standards "could result in chaos insofar as manufacturers, dealers, and users are concerned." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. N.Y. State Dep't of Envtl. Conservation*, 17 F.3d 521, 524 (2d Cir. 1994) (quoting S. Rep. No. 89-192, at 5–6 (1965)). Congress enacted the Clean Air Act of 1963, which was the first federal law to control air pollution. Federal standards for new motor vehicle engines were established in 1965, but states continued to develop their own laws. In response, Congress amended the CAA in 1967 to impose federal preemption over motor vehicle emissions standards, with one exception: California.

27. By the 1960s, California's air quality was arguably the worst in the nation, if not the world. In Los Angeles, the first "gas attack" of smog occurred in the summer of 1943. "Visibility was only three blocks. People suffered from burning eyes and lungs, and nausea." *History*, CARB, https://ww2.arb.ca.gov/about/history (last visited Aug. 14, 2024). As Senator George Murphy put it in his remarks before the Public Works Subcommittee when debating the 1967 emissions standards, Los Angeles was the "home of smog." Air Pollution–1967 (Air Quality Act): Hearings on S. 780 Before the Subcomm. on Air and Water Pollution, 90th Cong. 1779 (1967) (statement of Thomas C. Mann, President, Auto. Mfrs. Ass'n, Inc.). The only city where this congressional subcommittee assessed the matter of air pollution as consequential was Los Angeles. To compare: in Los Angeles

at the time, there were 83 days when the air pollutants exceeded permissible levels; there were only six such days in St. Louis, none in New Orleans, none in Chicago, none in Cincinnati, one in San Francisco, and nine in Philadelphia.  Air Quality Act of 1967: Hearings on H.R. 9509/S. 780 Before the Comm. on Interstate and Foreign Com., 90th Cong. 56 (1967) (statement of Dr. William H. Stewart, Surgeon General, Dep't of Health Educ. & Welfare).  Los Angeles was particularly bad due to the "particular combination of weather and circumstances which creates the control of the air and the motion of the air" leading to an "inversion" where "pollution accumulates" due to the hills.  *Id*. at 175-76.  As the smog crisis grew in California, the state took action, ultimately passing its own emissions laws and founding the California Air Resources Board in 1967.  S. Rep. No. 90-403, at 33 (1967).

28.    In debating amendments to the historical CAA, Senator Murphy persuaded the Senate Committee on Public Works that his state's "unique problems and pioneering efforts" up to that point warranted a waiver from preemption.  S. Rep. No. 90-403, at 33 (1967); *see Motor Vehicle Mfrs.*, 17 F.3d at 525-26 (quoting S. Rep. No. 90-403, at 33 (1967)).  Without such a waiver, the supremacy clause of the U.S. Constitution "invalidates state laws that 'interfere with, or are contrary to,' federal law."  *See Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 498 F. 3d 1031, 1039 (9th Cir. 2007) (quoting *Hillsborough Cty. v. Automated Med. Labs., Inc.,* 471 U.S. 707, 712 (1985); U.S. Const., art. VI, cl. 2.  "Federal preemption occurs when: (1) Congress enacts a statute that explicitly pre-empts state law; (2) state law actually conflicts with federal law; or (3) federal law occupies a legislative field to such an extent that it is reasonable to conclude that Congress left no room for state regulation in that field."  *Engine Mfrs. Ass'n*, 498 F. 3d at 1039-40 (quoting *Tocher v. City of Santa Ana*, 219 F.3d 1040, 1045–46 (9th Cir. 2000)).

29.    Current Vehicle Emissions Standards and Waiver.  Under Title II of the CAA, the EPA Administrator controls emissions caused by moveable sources or vehicle emissions (mobile source emissions).  Section 202 of the CAA authorizes the EPA Administrator to promulgate emission standards "applicable to the emission of any air pollutant from . . . new motor vehicles or new motor vehicle engines [sold in the United States] which in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare."  42 U.S.C. § 7521(a)(1).

Mobile emissions standards primarily encompass emissions of carbon monoxide (CO), hydrocarbons or volatile organic compounds (VOCs) and nitrogen oxides (NOx). 42 U.S.C. §§ 7521, 7541(c). Greenhouse gases (GHGs) also fall within the CAA's definition of "air pollutant," giving EPA authority to regulate the emission of such gases from new motor vehicles. *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007); 42 U.S.C. § 7602(g). Manufacturers subject to these standards must meet certain testing requirements and obtain an EPA certificate indicating compliance with the standards and applicable regulations before introducing a new motor vehicle into commerce. 42 U.S.C. § 7522(a)(1).

30.  Section 209 explicitly preempts state regulation of motor vehicle emissions; the sole exception is that California may seek a waiver from preemption to enforce certain of its own standards. 42 U.S.C. §§ 7543(b), (e). Yet Section 209 places parameters around California even when this exemption is available. In submitting proposed standards to EPA for "the control of emissions from new motor vehicles or new motor vehicle engines," CARB must first determine the standards "will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards." *Id.* In reviewing an application for waiver by CARB, EPA must not grant a waiver if it finds that:

> (i)  the determination of the State is arbitrary and capricious,
> (ii)  such State does not need such State standards to meet compelling and extraordinary conditions, or
> (iii)  such State standards and accompanying enforcement procedures are not consistent with [emissions standards that EPA prescribes under] section 7521(a) of this title.

42 U.S.C. § 7543(b) (CAA § 209(b)); *see also id.* § 7543(e)(2)(A).

31.  Although California is not explicitly mentioned in Section 209(b), that provision further requires that a state must have had certain new motor vehicle standards in place before March 30, 1966, and therefore it only applies to California. *See* 42 U.S.C. § 7543(b)(1). Congress crafted this narrow provision allowing California to request a waiver due to "California's unique problems" regarding air quality, as discussed above. *See Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*, 627 F.2d 1095, 1109 (D.C. Cir. 1979).

32.  Specifically regarding federal preemption of standards related to the purchase and sale of vehicles, the Supreme Court considered low-emission purchase restrictions and held that "[t]he

manufacturer's right to sell federally approved vehicles is meaningless in the absence of a purchaser's right to buy them." *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 255 (2004).

33.    In *Engine Manufacturers' Association*, California's South Coast Air Quality Management District had adopted six rules for fleet operators within the local jurisdiction (the "Fleet Rules").  The Fleet Rules applied to fleet operators of 15 or more vehicles, and covered street sweepers, public fleets, public transit vehicles, public and private garbage trucks, public and private airport transportation fleets, and public fleet operators of heavy-duty vehicles.  541 U.S. at 249.  These Fleet Rules prohibited the purchase or lease of vehicles by public and private fleet operators unless the vehicles complied with certain emission requirements, including when adding or replacing fleet vehicles, and therefore applied a purchase restriction rather than a manufacturer emissions standard. The Supreme Court rejected the argument that the Fleet Rules "escape[d] pre-emption under § 209(a) . . . because they address the purchase of vehicles, rather than their manufacture or sale."  *Id*.  The "end result" of such additional subdivisions in emissions standards "would undo Congress's carefully calibrated regulatory scheme."  *Id*. at 255.  As such, the Court held that Section 209(a) preempts purchase restrictions as emission "standards" because such restrictions "relate to the emission characteristics of a vehicle or engine."  *Id*. at 246.

34.    <u>Federal Clean-Fuel Fleet Program</u>.  Section 246 of the CAA mandates that certain states adopt and obtain federal approval of "restrictions on the purchase of fleet vehicles to meet clean-air standards."  *Id.* at 254 (emphasis omitted) (quoting *Engine Mfrs. Ass'n v. S. Coast Air. Quality Mgmt. Dist.*, 158 F. Supp. 2d 1107, 1118 (C.D. Cal. 2001); 42 U.S.C. §§ 7581-7590.  Known as EPA's Clean-Fuel Fleet Program (CFFP), states with "nonattainment" areas that do not meet federal standards for air pollutants in that area must adopt such restrictions for "centrally fueled fleets" as part of their state implementation plan (SIP) submitted to EPA.  42 U.S.C. § 7586(a).  These specified rules include a purchase requirement, which requires a percentage of all new covered fleet vehicles to be clean-fuel vehicles to meet federal emissions standards and phase-in requirements.  42 U.S.C. § 7586(b).  The rules also require that a state's SIP provide fleet operators with a choice among what type of fuel to use and vehicle to buy, so long as other standards are met.  42 U.S.C. §§ 7586(a),(b), and (d) (a fleet operator "shall" have "the choice of clean-fuel vehicles and clean alternative fuels").

35.     <u>F4A</u>.  In the same decade that Congress passed the CAA, Congress passed the Federal Aviation Act of 1958, which provided federal authority to regulate interstate airfare but did not explicitly preempt state regulation.  In 1978, as recent CAA Amendments (1977) were taking effect, Congress then deregulated the airline industry by passing the Airline Deregulation Act, including in the statute a state preemption provision.  Congress determined that "maximum reliance on competitive market forces would best further efficiency, innovation, and low prices as well as the variety and quality of air transportation services." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992) (cleaned up) (citing 49 U.S.C. §§ 1302(a)(4), 1302(a)(9)).

36.     In 1980, Congress also deregulated the trucking industry.  *See* Motor Carrier Act of 1980, Pub. L. No. 96-296, 94 Stat. 793 (1980).  Congress soon sought to apply state preemption language from the Airline Deregulation Act to the trucking industry.

37.     In 1994, Congress passed the F4A (at issue in this action), which prohibits a state from enacting or enforcing a law "related to a price, route, or service of any motor carrier . . . with respect to the transportation of property."  49 U.S.C. § 14501(c)(1); *see also Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 368 (2008).  The preemption language in F4A draws from the Airline Deregulation Act, which the Supreme Court interpreted as importing the broad preemption interpretation into the trucking industry context. *Id*. at 371.  Therefore, any state regulation "related to a price, route, or service of any motor carrier," is preempted under F4A.

**California's Adoption of Advanced Clean Fleets (ACF).**

38.     CARB has previously obtained multiple waivers to adopt and enforce emissions standards for *criteria pollutants*.  Over the past two decades, it has sought to regulate GHG emissions. The roots of CARB's current effort began with vehicle tailpipe standards in the late 2000s; more recently, CARB's efforts have taken a different form.

39.     CARB's movement toward issuing the ACF Regulations seemingly began in 2020, when it issued the Advanced Clean Trucks ("ACT") rule.  Cal. Code Regs. tit. 13, §§ 1963 *et seq*. Broadly speaking, ACT requires medium and heavy-duty vehicle manufacturers to sell ZEVs as a

certain percentage of sales, beginning with the 2024 vehicle model year and ending in 2035.  CARB's application for a preemption waiver from EPA for ACT was granted on April 6, 2023.[6]

40.    In 2021, CARB adopted the Heavy Duty Engine and Vehicle Omnibus ("Low NOx" or "Omnibus")  Regulation.[7]  Among other requirements, the regulation sets more stringent emissions standards for engine model years 2024 through 2031, including a phased-in 90% reduction of NOx emissions from heavy-duty on-road engines compared with existing standards.  CARB has reached an agreement with manufacturers and stated it will amend the standards to conform substantively with federal standards, after pushback by stakeholders on the sheer impracticability of the standards.[8]

41.    In 2022, CARB also updated its Advanced Clean Cars ("ACC") Program, which combines several regulations into one package including the Low-Emission Vehicle (LEV) criteria, greenhouse gas regulation, and the ZEV regulation.  First adopted in 2012, ACC I (2012), and subsequently ACC II (2022), have sought to reduce emissions of light-duty passenger cars, pickup trucks, and SUVs.  *See* Cal. Code Regs. tit. 13 § 1961.4.

42.    Against this backdrop, CARB approved ACF on April 27, 2023.[9]  The ACF Regulations took effect October 1, 2023.  ACF has become the latest development in CARB's quest to remake the automotive industry in California and beyond.[10]  The categories of requirements provided in the ACF Regulations are briefly summarized as follows.

---

[6] *California State Motor Vehicle and Engine Pollution Control Standards; Heavy-Duty Vehicle and Engine Emission Warranty and Maintenance Provisions; Advanced Clean Trucks; Zero Emission Airport Shuttle; Zero-Emission Power Train Certification; Waiver of Preemption; Notice of Decision*, 88 Fed. Reg. 20688 (Apr. 6, 2023).

[7] The Omnibus regulation comprises various amendments to title 13, California Code of Regulations (Cal. Code Regs. tit. 13 *passim*) and amendments to title 17 Cal. Code Regs. sections.

[8] Letter from Ellen M. Peter, Chief Counsel, CARB, to Jed R. Mandel, President, Truck Engine and Manufacturers Association (July 6, 2023), https://ww2.arb.ca.gov/sites/default/files/2023-09/2023-07-06%20CARB%20Response%20to%20EMA%20Request%20for%20Enforcement%20Discretion.pdf.

[9] CARB subsequently rescinded the regulations, and readopted them on August 28, 2023.

[10] Other CARB regulations regulating mobile source emissions include, for example, the Tractor-Trailer Greenhouse Gas Regulation (TTGHG), the heavy-duty vehicle inspection and maintenance (HD I/M, also referred to as Clean Truck Check (CTC)), and the Airborne Toxic Control Measure for Transport Refrigeration Units (TRU ATCM).

SEMA & NTEA COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

43.     <u>High Priority and Federal Fleets ("HPF") Requirements</u>.  The HPF provisions require fleet owners and operators to replace their heavy-duty vehicles with ZEVs.  Regulated entities are identified based on their revenue or fleet size, requiring a covered entity either to have $50 million or more in annual revenue or to own, operate, or direct the operation of 50 or more vehicles.  For a fleet to qualify as a "California fleet," one covered vehicle or more must be operated in California.

44.     Under ACF HPF, any new ICE vehicle added to a covered California fleet after January 1, 2024 must comply with California emissions standards—no matter whether that vehicle has been purchased or registered within or outside of California.  Cal. Code Regs. tit. 13 § 2015(r).  As such, ACF applies beyond California's borders, ensnaring any covered entity's covered vehicle that enters California and purportedly subjecting them to California's new vehicle emission standards.

45.     To comply, covered entities have one of two options: First, under the "model year schedule" (default option), any vehicle added to the California fleet—meaning, any vehicle that operates in California even if only once—after January 1, 2024 must be a ZEV, unless it was an ICE vehicle purchased before October 1, 2023.  Cal. Code Regs. tit. 13 § 2015.1(a)(1).  Beginning January 1, 2025, ICE vehicles must be removed from the California fleet by whichever of the following occurs first: January 1 of the calendar year after the minimum useful life mileage threshold was exceeded (as specified in the regulation), or January 1 of the calendar year the engine model year is 18 years old. Cal. Code Regs. tit. 13 § 2015.1(b).

46.     Alternatively, the "ZEV Milestone" (elective option) provides milestone groups by vehicle type that factor into an overall ZEV equation.  Each milestone group has a ZEV percentage goal that factors into the "ZEV Fleet Milestone Calculation," which determines the total number of ZEVs required in the fleet.  *See* Cal. Code Regs. tit. 13 § 2015.

47.     ACF HPF also creates verification requirements for third parties (so-called hiring entities) and an extensive list of extensions and exemptions.  The requirement to hire compliant fleets, the violation of which is subject to civil penalties, applies to "any motor carrier, broker, governmental agency, person, or entity that hires and operates or hires and directs the operation of vehicles in California".  *See* Cal. Code Regs. tit. 13 §§ 2015(a)(3), 2015.6.  This verification requirement puts the onus on companies to act as ACF's enforcer when contracting with third parties.

48.     In addition, ACF HPF provides a list of extensions and exemptions seemingly aimed at creating flexibility.  These carveouts generally excuse a fleet owner from compliance obligations or prohibitions that would otherwise pertain to an internal combustion engine vehicle operating in California.  *See* Cal. Code Regs. tit. 13 § 2015.3.

49.     The list of extensions and exemptions include, in summary: (i) *Backup Vehicle Exemption* for vehicles "operated less than 1,000 miles per year," which may be excused from the vehicle removal requirements for internal combustion engine vehicles, Cal. Code Regs. tit. 13 §§ 2015.1(c)(1), 2015.3(a); (ii) *Daily Usage Exemption* allows the fleet owner "to purchase a new ICE vehicle of the same configuration as an ICE vehicle being replaced," when "no new [battery electric vehicle] is available to purchase that can meet the demonstrated daily usage needs of any existing vehicles of the same configuration in the fleet," *id.* § 2015.3(b); (iii) *ZEV Infrastructure Delay Extension* from the vehicle removal requirements for internal combustion engine vehicles, *id.* § 2015.1(c)(3), or counting favorably toward the ZEV Milestone calculation, *id.* § 2015.2(f)(3), when the fleet owner "experience[s] delays due to circumstances beyond their control on a project to install ZEV fueling infrastructure," including (a) *Construction Delay Extension* for construction delays beyond the fleet owner's control, *id.* § 2015.3(c)(1), and (b) *Site Electrification Extension* "if the[] electric utility provider determines it cannot provide the requested power to the site where ZEVs will be charged or refueled before the fleet's next ZEV compliance deadline," *id.* § 2015.3(c)(2); (iv) *Vehicle Delivery Delay Exemption* similar to the infrastructure delay exemption, except that this exemption addresses ZEVs that a fleet owner has ordered but cannot be timely delivered, *id.* §§ 2015.1(c)(4), 2015.2(f)(4); (v) *ZEV Purchase Exemption* "to purchase a new ICE vehicle if a needed configuration is not available to purchase as a ZEV or [near ZEV] NZEV under the ZEV Purchase Exemption List . . . or the ZEV Purchase Exemption Application," *id.* § 2015.3(e); and (vi) *Exemptions Pursuant to Declared Emergency Events* for vehicle operation in California due to declared emergency response or mutual aid assistance, *id.* § 2015.3(f).[11]

---

[11] ACF also provides a five-day pass for operating vehicles in California on a temporary basis without otherwise having to comply.  Cal. Code Regs. tit. 13 § 2015.3(g).

SEMA & NTEA COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

50.     CARB has not yet provided the list of ZEV purchase exemptions supposedly available to carriers.  CARB states that by Jan. 1, 2025, it will establish and maintain the ZEV Purchase Exemption List to "specify vehicle configurations that are not available to purchase as ZEVs or NEVs" and the exemption expiration date.  *Id.* § 2015.3(e)(1).  For exemptions that are not specified, CARB will rely on information submitted by a carrier making an exemption request and "utilize their good engineering and business judgment" to determine what will go on the list.  *Id.*

51.     The daily usage exemption, infrastructure delay exemption, vehicle delivery delay extension, and the mutual aid assistance exemption pursuant to declared emergency events require the EO to "exercise" or "utilize" their "good engineering judgment" when deciding to approve the exemption or extension.  *Id.* §§ 2015.3(b),(c),(d), and (f).  For the ZEV purchase exemption, the EO must utilize "good engineering and business judgment."  *Id.* § 2015.3(e).

52.     <u>Drayage Truck Requirements</u>.  The ACF drayage truck rule regulates "owners and operators of on-road heavy-duty drayage trucks that operate at California seaports and intermodal railyards, drayage motor carriers and marine or seaport terminals, intermodal railyards and railyard and seaport authorities that operate in California."  *Id.* § 2014(a).  "Seaport property" is broadly defined as including even non-contiguously located parcels if "owned by the seaport."  *Id.* § 2014(b).

53.     The first compliance deadline for drayage truck owners and operators has passed.  By December 31, 2023, owners were required to register all drayage trucks operating in California in CARB's Online Tracking System.  *Id.* § 2014.1(a)(1)(A).  In addition, beginning January 1, 2024, a "legacy drayage truck must visit a California seaport or intermodal railyard at least once each calendar year" or be removed from the CARB online system and lose its registration status.  *Id.* § 2014.1(a)(1)(B).  Starting January 1, 2025, any registered legacy drayage truck must not exceed its minimum useful life threshold, or the owner/operator faces similar removal penalties.  *Id.* § 2014.1(a)(1)(C).  Going forward, for registered legacy vehicles, ACF forces owners to replace internal combustion engine vehicles with ZEVs, requiring all drayage trucks in California to be fully electric by 2035.  *Id.* § 2014.1(a)(1)-(2).  The forced replacement of vehicles not only damages Plaintiffs' members who make parts for ICE vehicles, but members who may wish to repair their trucks rather than replace them.

54.     To remain in compliance, covered entities must satisfy sales disclosure requirements and specific registration requirements, including annual updates of the odometer reading, engine family, and engine model year for all legacy trucks that are 12 years or older. *Id.* §§ 2014.1(a)(3)–(4). Drayage truck owners must also disclose to operators prescribed compliance language in their hiring agreements and ensure that each drayage truck under their control is in full compliance. *Id.* § 2014.1(a)(4)(C)–(D).  The Regulation provides additional requirements for drayage truck operators and so-called controlling parties, and seaport and railyard authorities are also required to report specified information on drayage truck compliance. *Id*.

55.     2036 ZEV Sales Mandate.  ACF bans manufacturers from certifying, after 2035, new on-road heavy-duty vehicles over 8,500 lbs. Gross Vehicle Weight Rating (GVWR)) with internal combustion engines.  *Id.* § 2016(c) ("Beginning with the 2036 model year, all vehicles produced by manufacturers [of new heavy-duty vehicles] that are produced and delivered for sale . . . in California must be ZEVs.").  There is also a zero-emission powertrain certification requirement for ZEVs over 14,000 lbs. GVWR and certain medium-duty ZEVs (8,501 through 14,000 lbs. GVWR).  *Id.* § 2016(d). Manufacturers covered by this requirement must report "for each on-road vehicle produced and delivered for sale in California for each model year" the VIN number, fuel and drivetrain.  *Id.* § 2016(e).

56.     Electrification mandate for state and local government fleets.  The rule places requirements on vehicles with a GVWR greater than 8,500 lbs. and that are owned or operated by state or local government agencies in California.  Beginning in 2024, 50 percent of vehicles purchased for state or local government agency fleets must be ZEVs, with ZEVs comprising 100 percent of vehicles purchased by 2027 or through another milestone target year option.  *Id.* §§ 2013(d)–(e).

57.     Health and Safety Code Prohibition on CARB Restrictions.  Even while CARB regulates mobile source emissions, the California legislature sets parameters over how this must be

accomplished.  In 2002 the California legislature passed a bill that laid out an extensive list of actions

CARB would be prohibited from enacting through its regulations.[12]

58.    The legislature directed that CARB's regulations must "achieve the maximum feasible

and cost-effective reduction of greenhouse gas emissions from motor vehicles."  Cal. Health & Safety

Code § 43018.5(a).  The legislation prescribed that "[i]n developing the regulations," CARB

> shall do all of the following: (1) Consider the technological
> feasibility of the regulations. (2) Consider the impact the regulations
> may have on the economy of the state, . . . [and] (3) Provide
> flexibility, to the maximum extent feasible . . . in the means by which
> a person subject to the regulations adopted . . . may comply with the
> regulations.

*Id.* §§ 43018.5(c)(1)–(3).  Most importantly, the legislature provided that CARB "shall not require

. . . [a] ban on the sale of any vehicle category in the state, specifically including, but not limited to,

sport utility vehicles and light-duty trucks."  *Id.* § 43018.5(d)(2).

59.    Subsequently, in 2004, CARB approved regulations regulating GHG emissions from

passenger vehicles beginning with the 2009 model year.  *See* California State Motor Vehicle Pollution

Control Standards; Notice of Decision Granting a Waiver of Clean Air Act Preemption for California's

2009 and Subsequent Model Year Greenhouse Gas Emission Standards for New Motor Vehicles, 74

Fed. Reg. 32743, 32744–32755 (July 8, 2009) (discussing background).  CARB applied to EPA for a

waiver of preemption under the CAA in 2005, and motor vehicle manufacturers, automobile dealers,

and trade associations subsequently challenged these regulations in federal and state court.  *See id.*

EPA denied California's waiver request in 2008.  But, after a change in administrations, EPA reversed

course and granted California a waiver.  *Id.*

**SEMA and NTEA Members Need to Comply with the ACF Regulations Now, Notwithstanding**
**CARB's Purported "Enforcement Stay" While It Seeks a CAA Waiver.**

60.    As noted above, CAA Section 209(b) requires, among other things, that California

obtain a waiver from EPA to impose its own emission-control standards, and California is prohibited

---

[12] *See* California's Greenhouse Gas Vehicle Emission Standards under AB 1493 of 2002 (Pavley);
An act to amend Section 12823 of, and to add Section 43018.5 to, the Health and Safety Code,
relating to air quality, A.B. 1493, Gen. Assemb., Reg. Sess. (Cal. 2002).

from enforcing such requirements for any period preceding the granting of a waiver.  42 U.S.C. § 7543(a).  When the ACF Regulations took effect on October 1, 2023, CARB had neither applied for nor received a waiver from EPA.  CARB applied to EPA for such a waiver on November 15, 2023, and the waiver request remains pending.[13]

61.     Upon transmitting its waiver request to EPA, CARB issued an "ENFORCEMENT NOTICE" that it would voluntarily stay its enforcement of ACF requirements pending EPA's waiver approval.[14]     But for manufacturers, owners, and operators, covered by ACF, the voluntary "enforcement stay" provides little comfort.  Under the terms of the stay order and as a practical matter, entities subject to the ACF Regulations effectively must begin complying *now*.

62.     In particular, in its Enforcement Notice, CARB asserted that it "has decided to exercise its enforcement discretion and will not take enforcement action as to the drayage or high priority fleet reporting requirements or registration prohibitions until U.S. EPA grants a preemption waiver applicable to those regulatory provisions or determines a waiver is not necessary."[15]   Critically, however, CARB's notice characterizes the regulations as *currently* effective (even though no EPA waiver has been granted), and CARB expressly reserves the right to enforce the ACF Regulations *as to this current, pre-waiver period* in the event an EPA waiver is subsequently granted:

> CARB encourages fleets to voluntarily report and comply while the waiver request is pending and *reserves all of its rights to enforce the ACF regulation* in full for any period for which a waiver is granted or for which a waiver is determined to be unnecessary, *including (but not limited to) the right to remove non-compliant vehicles added to fleets while the waiver request is pending*. CARB will also accept requests for the extensions and exemptions available under the ACF regulation during this period.

---

[13]  In the Matter of California's Request for Waiver Pursuant to Clean Air Act Section 209(b) and For Authorization Pursuant to Clean Air Act Section 209(e)(2) for California's Advanced Clean Fleets (ACF) Regulation, *Clean Air Act § 209(b) Waiver and § 209(e) Authorization Request Support Document Submitted by the California Air Resources Board*, Docket ID EPA-HQ-OAR-2023-0589-0004 (Nov. 15, 2023) ("Waiver Request"), https://www.regulations.gov/document/EPA-HQ-OAR-2023-0589-0004.

[14] *ACF Regulation – Enforcement Notice*, CARB (Dec. 28, 2023), https://ww2.arb.ca.gov/sites/default/files/2023-12/231228acfnotice_ADA.pdf.

[15] *Id*. at 1.

*Id.* (emphasis added).

63.     The caveats to CARB's enforcement stay subsume any guarantee that CARB will not enforce the requirements.  In particular, CARB's Enforcement Notice contains the following threats of enforcement for High Priority Fleets:

> Reporting is optional until the waiver is granted or determined to be unnecessary; *however, fleets will need to report* their fleet as it existed on January 1, 2024, as well as any removals or additions to the California fleet since January 1, 2024 . . . .

> *If fleets add internal combustion engine vehicles* to their California fleet after December 31, 2023, those fleets should expect to receive the following notice from CARB: "Any combustion-powered vehicles added into service in California in high priority or federal fleets after December 31, 2023, *may be restricted from operating* once the U.S. Environmental Protection Agency grants California a waiver for the Regulation pursuant to section 209 of the federal Clean Air Act or determines no such waiver is necessary.  Once the waiver is granted or determined to be unnecessary, *fleets may need to remove any vehicle* from the California fleet that was not eligible to be added to the California fleet after January 1, 2024 . . . ."

*Id.* at 2 (emphasis added).

64.     The Enforcement Notice includes similar threats regarding drayage vehicles, including that ICE drayage trucks added to CARB's reporting system after December 31, 2023 will be subject to removal and will be unlawful to operate as drayage trucks (as defined) in California.  *Id.*

65.     Moreover, CARB recognizes that, "under current industry conditions," many entities will be unable to comply with the ACF Regulations without purchasing ZEVs.[16]  In other words, entities must go out *now* and spend money to purchase new and different vehicles, or risk CARB pursuing them for sanctions later.

66.     The effect of CARB's enforcement stay is that CARB still considers itself as possessing authority to enforce ACF requirements, including retroactively from January 1, 2024, and against SEMA and NTEA members.  According to CARB, it may enforce requirements even retroactively so

---

[16] *See* Waiver Request at 20-21 ("[I]t is unlikely that there will be sufficient numbers of either used ZEVs or NZEVs or engine or vehicle conversion kits to enable drayage and HPF fleets to comply with applicable requirements solely by utilizing post-new vehicle sales, or by shifting vehicles within fleets, especially in the first few years of the ACF regulation's implementation.").

long as EPA someday grants CARB's waiver or determines a waiver is not required.  Under these circumstances, SEMA and NTEA members are currently being injured by the ACF Regulations and cannot take a wait-and-see approach to EPA waiver proceedings.  Moreover, as explained below, the challenges in this lawsuit do not implicate EPA's exercise of discretion under CAA Section 209(b) or (e); rather, the ACF Regulations are impermissible under federal and state law for a host of more fundamental reasons.

## FIRST CAUSE OF ACTION

## (FEDERAL PREEMPTION – CLEAN AIR ACT)

67.    Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 66.

68.    As stated above, the CAA provides the EPA administrator authority to set new motor vehicle air emissions standards, including for greenhouse gas emissions, 42 U.S.C. § 7521(a)(1), and CAA Section 209 expressly preempts any state "standard relating to the control of emissions from new motor vehicles".  *Id.* § 7543; *see supra* ¶¶ 29–33.  While Section 209(b) and (e) provide the Administrator discretion to waive preemption for state emission control standards that meet certain requirements, the ACF Regulations fall wholly outside any discretion that EPA may have.  Among other reasons, in granting the EPA waiver authority for California to address a particular problem— smog affecting metropolitan areas—Congress did not and could not have intended to allow California to ban entirely the operation of internal combustion engines, purportedly to address not local pollution issues, but global climate change.  *Cf. West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (holding that Section 111 of the CAA failed to provide EPA with authority to compel utilities to shift from fossil-fuel fired generation to renewable energy to address climate change, because Congress must, and did not in that case, in clear and unmistakable terms delegate authority to agencies that have substantial political, economic, and social consequences).

69.    The CAA provides EPA authority to issue emissions standards for "new motor vehicles or new motor vehicle engines" and to waive federal preemption for any such state standard—subject to certain requirements including that the standards must be consistent with the standards EPA itself may set.  42 U.S.C. §§ 7521(a)(1), 7543(b)(1)(C).  Section 209 does not permit California to set

standards (including enforcement procedures) for vehicles sold and registered in other states merely because those vehicles at times operate in the state.

70.     Further, the ACF Regulations improperly require that any new ICE vehicle added to a California fleet (as defined in ACF) must comply with California emissions standards no matter whether that vehicle has been purchased or registered outside of California.  *See* Cal. Code Regs. tit. 13 § 2015(r).

71.     In addition and independently, CAA Section 246 establishes a Clean-Fuel Fleet Program (CFFP), which requires certain states to establish programs and comply within specific parameters provided under federal law.  *See* 42 U.S.C. §§ 7581, 7586.  As pertinent here, to the extent a state may adopt its own clean-vehicle fleet requirements, it must provide covered fleet operators with "*the choice* of clean-fuel vehicles and clean alternative fuels" to use.[17]  *Id.* § 7586(d) (emphasis added).  Clean alternative fuels include combustion fuels, such as methanol, ethanol, or other alcohols, reformulated gasoline, diesel, natural gas, liquefied petroleum gas, and hydrogen, and are not limited to electric vehicles.  42 U.S.C. § 7581(2).

72.     The ability to have this choice is particularly important to SEMA, NTEA, and their members (both fleet owners and members who sell aftermarket parts).  So long as operators have the choice, that gives them flexibility and a range of cost-effective options to achieve compliance with clean-vehicle standards—including by retrofitting existing ICE vehicles—and allows for innovation.

73.     The ACF Regulations, in contrast, do not give fleet operators the choice.  They exclusively require the purchase of ZEVs and prohibit all other kinds of clean-fuel technology.  In this respect, the ACF Regulations directly conflict with, and are preempted by, Congress's intent underlying CAA Section 246.  *See Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 498 F.3d at 1044 (acknowledging that Section 246 could preempt a State's purchase mandate that precludes making a choice between alternative vehicle and fuel options).

---

[17] The statute defines clean-fuel vehicle as "a vehicle in a class or category of vehicles which has been certified to meet for any model year the clean-fuel vehicle standards applicable under this part for that model year to clean-fuel vehicles in that class or category."  42 U.S.C. § 7581(7).

74.     Moreover, CAA Section 209 and Section 246 should be read together and confirm that the waiver authority granted for certain emission control standards under Section 209(b) was not and could not be intended to allow for the wholesale ban of combustion engines and all other forms of clean-fuel technology.

## SECOND CAUSE OF ACTION

## (FEDERAL PREEMPTION – FEDERAL AVIATION ADMINISTRATION AUTHORIZATION ACT OF 1994)

75.     Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 74.

76.     The Federal Aviation Administration Authorization Act of 1994 (F4A) prohibits a state from enacting or enforcing a law "related to a price, route, or service of any motor carrier . . . with respect to the transportation of property."  Pub. L. No. 103–305, 108 Stat. 1569 (1994).  Here, ACF would impose massive costs on carriers to implement vehicle technology that is not commercially feasible or economically deployable.  Attempts to implement this mandated technology will impose high costs on carriers, which in turn will affect rates charged to customers.  For the same reasons, routes and services provided to customers will likely also be affected due to ACF.

77.     The F4A provides that a State "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . or any motor private carrier, broker, or freight forwarder with respect to the transportation of property."  49 U.S.C. § 14501(c)(1).

78.     Entities subject to ACF include motor carriers, motor private carriers, brokers, and freight forwarders with respect to the transportation of property because many are persons who provide motor vehicle transportation services of property for compensation.  *See id.* § 13102(2), (8), (14), (15).

79.     To be "related to" a price, route, or service under F4A, state laws and regulations need only have "a connection with . . . carrier rates, routes, or services."  *Rowe*, 552 U.S. at 370–71 (cleaned up) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)).

80.     The ACF Regulations specifically target, and aim to modify significantly, operations of motor carriers, thereby raising the prices charged to customers (rate) and affecting routes and services that drivers and carriers provide to customers, and to reach those customers.

24

81.     ACF will impose enormous costs of compliance by requiring motor carrier operators to overhaul their existing fleets—in many cases well before the end of their vehicles' useful lives, which alone is wasteful and environmentally harmful—to purchase and maintain what is currently experimental technology and its supporting infrastructure.  ACF will thereby affect rates charged to customers.

82.     ACF will bind motor carriers to a narrowed set of routes due to the lower range of ZEVs compared with ICE vehicles and the necessity for the route to be equipped with charging infrastructure at a sufficient scale.

83.     ACF will restrict available services to customers because the limited range and need for additional recharging of ZEVs will lower hours of operation and delivery speeds.  The regulation will also fully cease any services in and out of California by motor carries unable to comply.

84.     Carriers who are unable to comply with ACF requirements, based on the costs imposed or for other reasons, will be barred partially or entirely from routes into, out of, or through California, or otherwise forced to incur enormous additional operating costs.  For instance, a carrier who has 50 vehicles nationwide and operates only one or a few in California, such as to perform customer deliveries or distribution, would need to comply with ACF and may be barred on this basis.  To further illustrate, such a business forced to operate a ZEV in California with a fraction of the range of a diesel- or alternative-fuel vehicle—as is currently the case with commercially available technology—would experience massive delays from charging time, and may be forced to hire additional drivers, pay overtime wages to drivers for additional hours worked, and purchase additional vehicles to accomplish the same number of deliveries within the same timeframe.  Of course, increased costs would be incurred and passed onto customers through rates in this scenario.  And, many heavy-duty fleets have made investments in alternative-fueled fleets technologies that are already commercially available; these investments and the technology would be wasted under ACF.

85.     In addition, the ACF rules hamper efficiency, organic technological innovation, and market-based competition in commercial transportation services, defying Congress's "overarching goal" of the F4A: to "ensure transportation rates, routes, and services that reflect maximum reliance

on competitive market forces, thereby stimulating efficiency, innovation, and low prices." *Rowe*, 552 U.S. at 370–71 (quoting *Morales*, 504 U.S. at 378) (internal quotation marks omitted).

86.     The Supremacy Clause therefore prohibits Defendants from enforcing ACF as it is expressly preempted by the F4A as a regulation "related to a price, route, or service of any motor carrier . . . with respect to the transportation of property."  *See* 49 U.S.C. § 14501(c)(1).

**THIRD CAUSE OF ACTION**

**(VIOLATION OF DORMANT COMMERCE CLAUSE)**

87.     Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 86.

88.     ACF violates the Dormant Commerce Clause and is unconstitutional because it imposes a substantial burden on interstate commerce by imposing restrictions on fleets that operate interstate or nationwide.  ACF also irrationally discriminates in favor of certain local fleet owners against fleet owners that operate nationwide.

89.     The Constitution vests Congress with the power to "regulate Commerce . . . among the several States." Art. I, §  8, cl. 3. In doing so, Congress has the power to regulate mobile emissions at the federal level, as it has done under the CAA.  The Commerce Clause also gives Congress the power to preempt conflicting state laws.  *See id.* at Art. VI, cl. 2. Congress used this power when it precluded states from enacting their own mobile emissions laws, save for California, for which it carved out an exception. *See supra* ¶¶ 29–33.

90.     California's ability to promulgate emissions standards is limited by the Dormant Commerce Clause, which prohibits states from using their laws to discriminate purposefully against out-of-state economic interests.  *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 363–64 (2023) (rejecting a Dormant Commerce Clause challenge to a California law which forbade the in-state sale of pork from pigs bred in a cruel manner); *see also New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273–274 (1988) (holding the Commerce Clause prohibits the enforcement of state laws driven by "economic protectionism—that is, regulatory measures designated to benefit in-state economic interest by burdening out-of-state competitors.").  Anti-discrimination can occur when a state law either discriminates in favor of intrastate commerce or burdens interstate commerce by placing

1    restrictions on its instrumentalities, such as trucks, and thereby impedes the flow of interstate goods.

2    *Nat'l Pork Producers*, 598 U.S. at 380.

3         91.    Making this determination can require the assessment of whether the "practical

4    effect[s]" of the regulation in operation reveal a discriminatory purpose.  *Pike v. Bruce Church, Inc.*,

5    397 U.S. 137, 140 (1970).   In making this assessment, the Court has still left the door open to

6    challenges based on nondiscriminatory burdens by citing to previous caselaw where the Court "refused

7    to enforce certain state regulations on instrumentalities of interstate transportation – trucks, trains, and

8    the like."  *Nat'l Pork Producers*, 598 U.S. at 380 n.2; *see also, e.g.*, *Bibb v. Navajo Freight Lines, Inc.*,

9    359 U.S. 520, 523-530 (1959) (holding that a non-discriminatory state law specifying certain mud

10   flaps for trucks and trailers for safety reasons placed an unconstitutional burden on interstate

11   commerce).

12        92.    ACF irrationally discriminates against out-of-state carriers by imposing regulatory

13   burdens on them based on their nationwide operations.  In particular, a threshold requirement for the

14   high-priority fleet obligations is that the entity has "$50 million or more in total gross annual revenues,

15   including revenues from all subsidiaries, subdivisions, and branches" nationwide; or that the entity

16   owns 50 or more vehicles in its total fleet (including all vehicles within the fleet nationwide or all

17   fleets nationwide that are under common control).  Cal. Code Regs. tit. 13 § 2015(a)(1).  Thus, a local

18   California fleet owner with 49 vehicles need not comply; but the requirements would apply to a

19   nationwide fleet owner with one vehicle operating in California and 49 other vehicles operating

20   nationwide.  In other words, the regulation has the effect of protecting local fleet owners over national

21   ones, even where the local fleet owner has more vehicles in California (and thus presumably would

22   create more emissions in the state).  Regardless that all entities—local or national—must comply if

23   they meet the same criteria, the clear effect of the regulation is to advantage locally owned fleets over

24   fleets owned by entities with a presence across the country.

25        93.    ACF also impedes the flow of interstate goods in multiple ways.  First, ACF restricts

26   the type of vehicles that may be operated in California, even if the vehicle is primarily or solely used

27   to ship goods in interstate commerce.  All it takes is for a vehicle to enter California for one day and

28

that vehicle becomes part of an entity's California fleet (unless the vehicle receives a 5-day pass, the process for which is still unclear).  *See* Cal. Code Regs. tit. 13 § 2015.3(b).

94.     Second, ACF requires registration with CARB for a vehicle to be able to operate in California.  Even out-of-state vehicles that enter California only once, temporarily, fall within an entity's "California fleet" and must be registered with CARB.  *See id*. § 2015(b) (definition of "California fleet").  This requirement imposes reporting obligations on vehicles that might otherwise operate solely in non-California states and consequently the costs associated with maintaining compliance with an otherwise unnecessary regulatory scheme.

95.     Third, ACF forces carriers to buy-in to a new type of vehicle and supporting infrastructure that is not widely commercially available and is cost prohibitive.  Not only has CARB failed to demonstrate that any of ACF's local benefits outweigh the enormous burdens on interstate commerce, it has done so by choosing to simply ignore the reality on the ground.  The charging infrastructure required for the full electrification of charging infrastructure for medium- and heavy-duty trucks is massive and nonexistent as of the date of the rule.  ACF seems to acknowledge the rule's failure by explicitly creating an exception for "infrastructure delays," yet not bothering to detail what this would look like in practice given that necessary infrastructure is currently widely unavailable.  *See* Cal. Code Regs. tit. 13 § 2015.3(c).

96.     Finally, unlike the California ballot measure (Proposition 12) at issue in *Natl. Pork Producers*, no such measure was presented to CARB and ACF is a regulation that extends beyond what any voter would have authorized CARB to regulate.  *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 345 (2007) (holding that the Dormant Commerce Clause is not offended by higher prices "likely to fall upon the very people who voted for the [challenged] law[]"); *see e.g.*, *Natl. Pork Producers*, 598 U.S. at 365 (California Proposition 12, which 63% of participating voters approved of when passed in Nov. 2018).  Yet here, not only did California voters not vote on this rule, but the out-of-state entities and vehicles operating out-of-state impacted by this rule had no say at all.  Congress' intended preemption of state law in this arena becomes a national standard dictated by California, under ACF.

**FOURTH CAUSE OF ACTION**

**(VIOLATION OF CAL. HEALTH AND SAFETY CODE SECTION 43018.5)**

97.     Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 96.

98.     The ACF Regulations violate the California legislature's ban on CARB issuing such regulations, because the ACF Regulations ban an entire category of vehicle.

99.     CARB issued ACF "to achieve criteria and GHG emissions reductions and is a cost-effective way to achieve needed health benefits to protect communities."  CARB, Public Hearing to Consider the Advanced Clean Fleets Regulations, Final Statement of Reasons for Rulemaking, Including Summary of Comments and Agency Response at 120 (Apr. 27–28, 2023).

100.     The California Code of Health and Safety, sections 43000 *et seq*. establishes the statutory framework under state law for CARB to set standards that regulate vehicle air pollution. Among the requirements provided within that framework, section 43018.5 sets requirements for the adoption of GHG emissions regulations.   The statute requires that in adopting GHG emissions regulations, CARB "shall not require . . . [a] ban on the sale of any vehicle category in the state, specifically including, but not limited to, sport utility vehicles and light-duty trucks."  Cal. Health & Safety Code § 43018.5(d)(2).

101.     Section 43018.5 of the Health and Safety Code was enacted in 2002 and specifically intended to assuage public fears that CARB might ban certain kinds of vehicles.  Yet here, in issuing the ACF Regulations, CARB realizes the precise fears the legislature intended to prohibit.  Through these ACF Regulations, CARB will prohibit the sale of an entire category of vehicles—vehicles with ICE engines—within the state and will require that only ZEVs may cross within California's borders, regardless of the state of purchase or the state of registration or domicile for the vehicle.  These requirements function as a complete ban on vehicle categories, in direct conflict with section 43018.5 of the Health and Safety Code.

**FIFTH CAUSE OF ACTION**

**(VIOLATION OF EQUAL PROTECTION)**

**(U.S. Const., 14th Amend.; Cal. Const., art. I, § 7)**

102.     Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 101.

103.    The U.S. Constitution prohibits states from denying equal protection of the law.  U.S. Const. amend. XIV.  California's Constitution has a similar clause guaranteeing equal protection in article I, § 7.

104.    For the reasons discussed above, the ACF Regulations are arbitrary and Defendants have not provided, nor is there any rational justification for Defendants' unequal treatment of out-of-state companies under the ACF Regulations in setting requirements for fleets and other covered entities under the regulations.  As discussed, the ACF Regulations discriminate against companies that are based outside of California but operate within California, and, in particular, are arbitrary due to the compliance burden placed on out-of-state companies who operate fewer assets in California compared with companies based in California.  The ACF Regulations therefore failed to provide equal protection of the law under both the federal and California constitutions.

**SIXTH CAUSE OF ACTION**

**VIOLATION OF DUE PROCESS FOR VAGUENESS**

**(U.S. Const., 5th & 14th Amends.; Cal. Const., art. I, § 7)**

105.    Plaintiffs re-allege and incorporate by reference Paragraphs 1 through 104.

106.    The ACF Regulations are impermissibly vague based on multiple instances of blatant contradictory and confusing language, and unfettered discretion provided to CARB.  These deficiencies are not little nits—instead, they render an entity's basic compliance obligations unintelligible to where entities cannot determine who must comply or how they must comply.  The requirements also fall susceptible to subjective enforcement by CARB and the CARB Executive Officer (EO) or Attorney General.

107.    The U.S. Constitution prohibits the deprivation of "life, liberty, or property, without due process of law."  U.S. Const. amend. V, amend. XIV.  California's Constitution has a similar due process clause in article I, § 7.

108.    When federal or state agencies enact "prohibitions [that] are not clearly defined," it is a "basic principle of due process" that these requirements are "void for vagueness."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *see also Vill. of Hoffman Estates. v. Flipside, Hoffman Estates., Inc.*, 455 U.S. 489, 503 (1982).  First, such statutes must "give the person of ordinary intelligence a

reasonable opportunity to know what is prohibited so that he may act accordingly." *Grayned*, 408 U.S. at 108.   Second, to prevent "arbitrary and discriminatory enforcement," "laws must provide explicit standards for those who apply them."   *Id.*; *see Tobe v. City of Santa Ana*, 9 Cal. 4th 1069, 1106–07 (1995).

109.    In promulgating ACF, CARB failed to craft the defining provisions sufficiently to determine the regulation applicability to certain entities, and those entities' obligations.  Many of these provisions concern "key" obligations under ACF.

110.    CARB's shortcomings are exemplified by the repeated, ongoing failed attempts of the agency to clarify the obligations of covered entities.  Since enacting ACF in 2023, CARB has held nearly 30 public meetings and events of webinars, formed multiple implementation working groups, (e.g., from the truck regulation implementation working group, CARB created the border communities work group, infrastructure work group, outreach work group, and rule provisions work group), published nearly 30 supplementary fact sheets (covering general facts, additional detail, exemption and extensions, enforcement), entire video training materials, guides, modules, and regulation-specific tools, updated online descriptions, and finally fielded an untold number of questions from carriers.[18]

111.    ACF HPF applies, at its baseline, to "any entity that owns, operates, or directs the operation of one or more vehicles [as defined] in California."  Cal. Code Regs. tit. 13 § 2015(a)(1). From there, the reader proceeds to determine their compliance obligations through a maze of definitions, carveouts and exceptions that leaves even the most careful reader guessing at what they must do to comply.

112.    Prominent examples of ACF's vague language include:

    a.    <u>Duplicate reporting</u>.  In determining the entity subject to ACF High Priority Fleets obligations for a particular vehicle, the regulation appears to ask different

---

[18] *Advanced Clean Fleets Fact Sheets*, CARB, https://ww2.arb.ca.gov/our-work/programs/advanced-clean-fleets/advanced-clean-fleets-fact-sheets; *Advanced Clean Fleets – Meetings & Events*, CARB, https://ww2.arb.ca.gov/our-work/programs/advanced-clean-fleets/advanced-clean-fleets-meetings-events.

entities to report the same vehicle.[19]  For example, if one entity owns the vehicle and another has "common ownership or control" over the vehicle, then both entities must comply for that vehicle including factoring the vehicle into their ZEV compliance obligations.  This example applies even in an arm's length transaction, such as where one entity owns the vehicle and another operates it as an independent contractor.  But both entities must factor the vehicle into their ZEV compliance obligation and, therefore, apparently must *coordinate* with one another regarding the transition of that vehicle to a ZEV and the other compliance obligations, such as reporting.

      b.    <u>Hiring Entity reporting</u>.  In addition to owners, lessees, and controlling parties, ACF HPF applies to so-called hiring entities, which refers to "any motor carrier, broker, governmental agency, person, or entity that hires and operates or hires and directs the operation of vehicles in California."  Cal. Code Regs. tit. 13 § 2015(a)(3).  The regulation requires that these hiring entities, "[f]or each calendar year, verify that each fleet it hires or dispatches to operate in California is listed on the CARB [ACF] webpage as a compliant fleet."  *Id.* § 2015(g)(1).  Putting aside the troubling fact that this provision enlists private parties as *de facto* CARB-enforcers of ACF requirements, subject to civil penalties if the hired entity dispatches a noncompliant vehicle (whether or not known to the hiring entity), it is impossible to discern who "directs the operation of vehicles" such that they are subject to the requirements.  For instance: does a dispatcher direct the operation of vehicles when assigning a route?  What about a shipper, who requests that a carrier pick up a load and deliver it without prescribing the vehicle to be used or how it should travel?  What if an entity hires a carrier thinking they are compliant, and that carrier subcontracts the load—is the hiring entity liable if the subcontractor is noncompliant?  These potential "hiring

---

[19] Cal. Code Regs. tit. 13 § 2015(b) (definition of "Fleet" includes vehicles "owned by a fleet owner or that are operated under the common ownership or control of a controlling party").

SEMA & NTEA COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

entities" are left guessing, subject to civil penalties anytime they ask a carrier

to operate in California.

c.    Indeterminate application to rented/leased vehicles. The provisions for

determining obligations related to rented and leased vehicles are impermissibly

vague.   ACF HPF provides a rule that appears to make rental companies

responsible for their vehicles in many, but not nearly all, circumstances using

the following web of criteria:

> For vehicles that are rented or leased from a business that
> is regularly engaged in the trade or business of renting or
> leasing motor vehicles without drivers, including truck
> leases that are part of a bundled service agreement, the
> owner shall be presumed to be the rental or leasing entity
> for purposes of compliance, unless the rental or lease
> agreement for the vehicle is for a period of one year or
> longer and the terms of the rental or lease agreement
> identifies the renting operator or lessee of the vehicle as
> the party responsible for compliance with state laws.

*Id.* § 2015(b).  One can discern that rental vehicles are the rental company's

responsibility *unless* the lease is one year or longer.  But an additional criterion

is provided that the lease must also identify the lessee "as the party responsible

for compliance with state laws."   Some questions raised by this provision

include: (i) A lease makes a lessee responsible for compliance with "all

applicable laws and regulations"—is the lessee responsible because state laws

are included in this compliance obligation, or are they not responsible because

the language is too broad?  (ii) A lease has an indefinite term and auto-renews,

with the final lease period exceeding one year before the vehicle is turned in—

does this meet the criteria of "one year or longer"?

d.    Open-ended vehicle purchase exemption.  As a final example—though there

are many more—the vehicle purchase exemption provides that regulated

entities may apply for an exemption to purchase an ICE vehicle if the specific

configuration is unavailable to purchase as listed under a "ZEV Purchase

Exemption List" published by CARB or a "ZEV Purchase Exemption

33

Application."  To apply for this exemption, an owner must submit a vehicle application that includes its "[m]ake, model, weight class, configuration," information on "whether the vehicle has a crew cab, cabover, or all-wheel drive," and "clear and legible photographs of the entire left and right sides of the vehicle with doors closed showing the vehicle's body configuration".  *Id.* § 2015.3(e)(2)(a)(1).  In addition, the owner must submit certain documentation from two or more manufacturers stating "the manufacturer does not offer for sale" a ZEV or near-ZEV "of the needed configuration." *Id*. § 2015.3(e)(2)(B).  CARB will then determine if the configuration qualifies for an exemption based on a list of criteria plus CARB's own "good engineering and business judgment." *Id*. §§ 2015.3(e)(1), (2)(C)-(D).  CARB has not published this list and states that they "will maintain" a list starting in 2025.[20]  Without a list, no entity can apply for the exemption.  Beyond being overly burdensome, given CARB's discretion in approval, and lack of actual list to compare against, this provision is vague and violates due process.

113.    These questions are not hypothetical nit-picks.  The questions above impact thousands of carriers and other regulated parties doing business in California and neighboring states every day, for untold thousands of loads hauled and untold amounts of civil penalties if CARB disagrees with the entity's interpretation of this incomprehensible text.

114.    For instance, the types of vehicles that SEMA and NTEA members build and operate are highly specialized; many require unique chassis features which are less available and least likely to be available on an electric or fuel cell chassis in the future.  The end users of these vehicles are often, by necessity, "last adopters" due to the mission-critical nature of the work they perform.  These vehicles also typically have long production lead times due to required upfitting or modifications.  End-users of emergency vehicles, for example, do not have the ability to explore and experiment with

---

[20] *Advanced Clean Fleets Regulation Exemptions and Extensions Overview*, CARB, https://ww2.arb.ca.gov/resources/fact-sheets/advanced-clean-fleets-regulation-exemptions-and-extensions-overview (Aug. 31, 2023).

1   new technologies in the same way other fleet types are able to.  And CARB's opaque process for

2   issuing exemptions leaves these companies guessing as to whether a certain type of vehicle—or even

3   an individual upfitted vehicle, depending on the level of specificity that CARB eventually decides is

4   required—may be sold or operated in California.

5          115.    A fundamental question left open in the ACF Regulations is, how will the monumental

6   challenge of developing a charging infrastructure be accomplished commensurate to the regulatory

7   requirements proposed for medium- and heavy-duty vehicles?  In addition to developing even the most

8   basic infrastructure, which is not currently available for medium- and heavy-duty vehicle charging,

9   infrastructure must also be adapted to meet the unique demands of the wide range of work trucks

10  operating across California including in remote areas.   CARB offers exemptions such as for

11  infrastructure delays and when battery electric vehicles are unable to meet "daily usage" requirements

12  of the fleet, which seemingly could include mileage range and location requirements.  But, again,

13  CARB has unfettered discretion to adjudge when an exemption is warranted.  Manufacturers and fleets

14  cannot rely on CARB's discretion to approve exemptions for entire categories of vehicles when such

15  exemptions are not clearly reflected in the regulation, even more concerning for fleets operating

16  specialized vehicles.

17         116.    Other requirements in the ACF Regulations (such as for drayage trucks) suffer from

18  similar, impermissibly vague provisions.

19         117.    In addition, in delegating enforcement authority to CARB and its Executive Officer,

20  ACF unlawfully authorizes the arbitrary and discriminatory enforcement of the rule on an *ad hoc* and

21  subjective basis.

22         118.    ACF includes various exceptions and extensions. *See supra* ¶¶ 48–51.  An entity

23  required to comply may theoretically be excepted from requirements for any one of various reasons.

24  A prime example is the "daily usage" exemption, which fails to define daily usage.

25         119.    Yet, these exceptions and extensions are vague and grant too much discretion to CARB

26  for a regulated entity to rely upon.  CARB (through the EO) are the sole determiners as to whether an

27  extension or exemption may be granted.  Cal. Code Regs. tit. 13 § 2015.3.

28

120.    For example, in determining whether the vehicle delivery or infrastructure delay extensions, or daily usage exemption applies, the EO will "utilize their good engineering judgment to determine whether" the exemption is granted.  *Id*. § 2015.3(b)(6). In determining whether the ZEV Purchase Exemption applies, the EO is instructed to rely on "good engineering and business judgment." *Id.*  § 2015.3(e).  The pervasive subjective decision making authority that ACF grants to CARB and the EO make ACF's enforcement arbitrary and discriminatory.

121.    In sum, given ACF's blatant contradictory and confusing language and the subjective discretion with which CARB and the EO can apply the extensions and exemptions necessary to make the statute practicable, the statute itself is vague and constitutionally void as it stands today.

## PRAYER FOR RELIEF

122.    WHEREFORE, Plaintiffs respectfully request that the Court:

A.    Declare the ACF Regulations invalid and unenforceable pursuant to 28 U.S.C. § 2201 and California Code of Civil Procedure § 1060;

B.    Issue a permanent injunction enjoining Defendants from implementing or enforcing the ACF Regulations;

C.    Award Plaintiffs such costs of suit and attorney's fees to which Plaintiffs may be entitled to by law, including, without limitation, 42 U.S.C. § 1988 and California Code of Civil Procedure § 1021.5; and

D.    Award such other relief as the Court deems just and proper.


Date:  October 8, 2024                                       SIDLEY AUSTIN LLP



                                                             By: /s/ *Caleb J. Bowers*
                                                             Caleb J. Bowers

                                                             Attorney for Plaintiffs
                                                             SPECIALTY EQUIPMENT MARKET
                                                             ASSOCIATION & PERFORMANCE
                                                             RACING, INC.; NATIONAL TRUCK
                                                             EQUIPMENT ASSOCIATION

SEMA & NTEA COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF